DETERMINED IN THE

# FIRST DEPARTMENT

AT

# GENERAL TERM,

### October, 1877.

---

## CHRISTIAN F. A. DAMBMANN, Respondent, v. HERMAN SCHULTING, Appellant.

*Moral obligation — agreement to pay debts when able — enforcement of — fraudulent concealment — effect of — duty of debtor asking release from creditor.*

The plaintiff and others entered into an agreement by which, in consideration of one dollar to them paid, they agreed to discharge H. Schulting from the legal obligation to pay certain money loaned to him February, 1866 "said Schulting giving his moral obligation to refund the said money in part or whole as his means will justify in the future." *Held,* that Schulting was not thereby absolutely discharged from the debt, but that the agreement merely suspended his legal liability until he should be in such a condition as that a moral obligation to pay it would fairly exist, and that then his failure to perform this moral obligation would revive the legal liability, and the same could be enforced by action. (Brady, J., dissenting.)

In August, 1868, Schulting sold his stock in trade to S. & Co. for $225,000, out of which they were to pay debts amounting to about $192,000, the balance to go to him, he being also entitled to one-third of any amount which S. & Co. might realize on the sale of the stock over the purchase-price. In the same month he called upon plaintiff and made a statement as to his affairs, telling of the sale and stating that his one-third in the surplus over the $225,000 was worth little or nothing; that he had offered to sell it for $20,000. He had, in fact, made an offer to sell it at that price, but withdrew it in a few days; subsequently he realized $90,000 for it.

In October he paid the plaintiff $5,000, and procured from him a release of the whole debt, $10,000. At the time of this payment S. & Co. had already realized over $400,000, for the stock of goods, and a large amount was still unsold, of which facts he said nothing to the plaintiff, who was ignorant of them. *Held*

that it was a fraud on his part to conceal those facts from the plaintiff, and that the release given to him was avoided thereby.  (BRADY, J., dissenting.)

The utmost good faith is required of a debtor seeking to procure a discharge from his indebtedness for less than its full amount; and he is bound not to induce, or to permit the action of his creditor to be influenced, by any false representation, material concealment, or ignorance of any fact, touching his own real condition.  (BRADY, J., dissenting.)

APPEAL from a judgment in favor of the plaintiff entered upon the trial of this action by the court, without a jury.

This action was brought to have a release, given upon the receipt of one-half of a debt due from the defendant, set aside on the ground that it was executed under a mistake of material facts caused by the representations and concealments of the defendant, and to recover from him the balance of the indebtedness remaining unpaid, with the interest due thereon.

It appears from the findings of the justice before whom the action was tried, that, on the 17th day of February, 1866, Charles F. Dambmann & Co. loaned to defendant $10,000, to be paid whenever he should be able to pay the same.  That plaintiff is the sole surviving partner of said firm, and the sole owner of this claim.  On the 7th of March, 1867, the plaintiff's firm, with other of defendant's creditors, entered into and executed an agreement with the defendant in these words:

"We, the undersigned, agree, in consideration of one dollar paid to us, to discharge H. Schulting from the legal payment of the money loaned to him February 1, 1856, said Schulting giving his moral obligations to refund the said money in part or whole, as his means will allow in future."

On the 8th of October, 1868, the defendant paid to plaintiff's firm the sum or $5,000, and the plaintiff's firm, with the other creditors of defendant, executed to defendant a general release under seal, releasing the defendant from all claims and demands. The $5,000 so paid being the $5,000 mentioned in the following receipt:

"NEW YORK, *7th October*, 1868.

"Received from Mr. Herman Schulting, five thousand dollars, in full of all claims to date.                 $5,000.

{ Revenue }
{ stamp. }                       "C. F. DAMBMANN & CO."

That prior to this release, and in August, 1868, defendant sold his large stock of goods to Stursberg & Co. for $225,000, on the terms that Stursberg & Co. pay his debts — amounting to $192,000 — the balance of.the $225,000 to go to defendant, and with an agreement that Stursberg & Co. should pay to defendant one-third or any amount for which Stursberg & Co. might sell the said goods over $225,000.

That early in the same month of August, defendant made a statement to the plaintiff of his means in detail, of his sale to Stursberg & Co., and stated to plaintiff that the one-third interest in the sum of which the goods would realize over $225,000 was worthless, and he had offered to sell it for $18,000 or $20,000.

That defendant did offer to sell the said interest for $20,000, but in a few days after withdrew his offer and refused to consummate the same.

That said interest was worth $100,000, and defendant did realize $90,000 for the same.

That on the 6th October, 1868, defendant came to ,the store of plaintiff and obtained the release aforesaid on the payment by him of $5,000.

That a portion of the goods aforesaid had then been sold by Stursberg & Co. for $400,000, and a sale of the residue increased the total sum to $576,981.

That defendant, at the time, had knowledge of the sale of said goods for $400,000. Plaintiff had not.

That defendant has means sufficient to pay the debt in question, and is worth upwards of $100,000.

*C. Bainbridge Smith*, for the appellant. An action is not maintainable upon a moral obligation. (*Stafford* v. *Bacon*, 1 Hill, 539; S. C., 2 id., 353; *Ex parte Hall*, 1 Deac., 171; S. C., 38 E. C. L., 426.) The general release under seal, executed by the creditors of the defendant to him on the 6th of October, 1868, could only be declared invalid on the ground of fraud; and to establish such fraud the evidence must be clear, precise and indubitable. (*Lefler* v. *Field*, 52 N. Y., 621; *Penn. R. Co.* v. *Shay*, 3 Weekly Dig., 211; *Stine* v. *Sherk*, 1 W. & S., 195 . *Irwin* v. *Shoemaker*, 8 id., 75; *Dean* v. *Fuller*, 4 Wright, 47; *Wilson* v. *Wilson*, 2 Dev. Ch., 181; *Dudley* v. *Scranton*, 57 N. Y., 424.)

*W. Watson,* for the respondent. An act done, or contract made under a mistake or ignorance of a material fact, is voidable and relievable in equity. (1 Story Eq., §§ 140–193.) The rule applies not only to cases where there has been a studied suppression or concealment of the facts by the other side, which would amount to fraud, but to many cases of innocent ignorance on both sides. (*Curtis* v. *Leavitt,* 15 N. Y., 193 ; 9 Pick., 130 ; 8 Barb., 233 ; *Hammond* v. *Pennock,* 61 N. Y., 145 ; *Park* v. *Gurney,* L. R., 13 Eq., 79, 113 ; *Smith* v. *Run. R. Co.,* L. R., 2 id., 264 ; *Michigan* v. *Phœnix Bank,* 3 N. Y., 24 ; *New York Exch. Co.* v. *De Wolf,* 31 id., 273 ; *Carter* v. *Boehm,* 3 Burr., 1910 ; *Van Cortland* v. *Underhill,* 17 John., 405 ; *Dobson* v. *Pierce,* 2 Kern., 164.) The agreement first set up in the answer to discharge Schulting without payment, he giving his moral obligation to refund the money in part or in whole, as his means will allow, is without consideration and void. (1 Smith's Lead. Cas., 350, where cases are collected ; *Fitch* v. *Sutton,* 5 East, 250 ; 2 B. & A., 313 ; *Stratton* v. *Rastall,* 2 T. & R., 366.) If this were a composition agreement, it is subject to one fatal objection, viz., the terms on which it was given have not been complied with. Schulting, so far from giving his moral obligation to refund when he is able, directly refuses to refund. His ability was clearly shown. All the cases hold that if the terms of the composition agreement be not exactly followed by the debtor, the creditor is remitted to his original rights ; the *onus* is with the debtor. (*Fellows* v. *Stevans,* 24 Wend., 302 ; *Dalsen* v. *Arnold,* 10 How., 530 ; *Oughton* v. *Trotter,* 2 N. & M., 71 ; *Cranby* v. *Hilay,* 2 M. & S., 120 ; *Rosling* v. *Maggendye,* 16 M. & W., 181 ; *Evans* v. *Purvis,* 1 Exch., 601.) This writing lacks every element of a composition deed. The debtor pays nothing. The creditor does not discharge in full, but leaves a moral obligation in force. (*Garard* v. *Woolner,* 8 Bing., 258 ; *Fellows* v. *Stevens,* 24 Wend., 302.)

DAVIS, P. J. :

The learned justice at Special Term, in deciding this case, pronounced the following opinion :

"VAN VORST, J. The agreement, signed by the plaintiff's firm, with others of the defendant's creditors, on the 17th day of March,

1867, is in these words, 'We, the undersigned, agree, in consideration of one dollar paid to us, to discharge H. Schulting from the legal payment of the money loaned to him, February, 1866, said Schulting giving his moral obligation to refund the said money in part or whole, as his means will allow in the future.'

" I do not regard this paper, as is claimed by the defendant's counsel as an absolute discharge of the debt in question, and there was substituted and accepted in place thereof a moral duty only, not to be enforced by action in the event that the debtor should afterwards acquire means sufficient to enable him to pay the claim in whole or in part.

" The agreement to discharge 'from the legal payment' is, in fact, conditioned upon the debtor's promise to refund the money loaned should he acquire the means in the future to do so. If he did not acquire such means then all legal claim was abandoned, but if he did, the legal claim existed, to be enforced by action in the event that the conscience of the debtor refused to recognize the obligation to pay the money.

"The paper may, in truth, be regarded as an agreement not to enforce the legal liability, so long as the debtor was without means to pay.

"And the evidence shows that the defendant yet considered himself under a valid obligation to pay; hence afterwards, and on the 6th day of October, 1868, he paid the plaintiff $5,000 of the original loan of ten thousand, and received the signature of the plaintiff's firm, under seal, to a complete and full release from all claim and demand whatever. The plaintiff claims that the signature of his firm was obtained to the release by false statements and suppression of material facts made by defendant, and that, had the truth been stated they would not have executed the release. In August, 1868, the defendant sold his large stock of merchandise to Stursberg & Co. for the sum of $225,000, the purchasers to pay his debts thereout, amounting to about $192,000. By the conditions of sale the defendant was entitled to one-third of any amount Stursberg & Co. might realize on a resale thereof over and above the amount they had paid for same.

" Early in the same month the defendant made a statement to the plaintiff of his means, entering into details, and, among other things, gave the particulars of his transactions with Stursberg & Co., and

added, ' as for that one-third interest in the sum which the goods would realize over $225,000, that was worthless. It was worth little or nothing. In fact, he had offered to sell it the other day for $18,000 or $20,000.

" Now, the facts with regard to such one-third interest and its value may be in short stated as follows : The defendant did offer to sell the same to one Von Keller for $20,000, but in a day or two afterwards withdrew the offer, and refused to consummate it. This one-third interest was, in truth, worth about $100,000. Defendant did in the end realize in money $90,000 for the same.

" When the defendant called in October and paid the $5,000, and obtained the release, Stursberg & Co. had already realized over $400,000 for the goods then sold, and subsequent deliveries increased the total sum realized to $576,981.

" Yet the defendant made no statement to the plaintiffs, when he obtained the release, with respect to the value of his interest in such proceeds. I think he was under a positive duty to have done so. An obligation was resting upon him to pay the debt due plaintiff in full, if his means were sufficient for the purpose. His interest in the one-third of the proceeds of the sales already realized, and with what might be reasonably expected to be realized from the residue of the goods, were enough, with other means in his possession, to pay in full all the claims covered by the agreement of March, 1867.

" The parties were not standing upon an equal footing. Plaintiff was ignorant of the facts, having been informed, in August, by the defendant that, in his estimation, the value of his interest was little or nothing. He was under a positive duty to correct the former judgment he had given, and to state the facts fully and truly.

" His concealment of these facts rendered the release he obtained inoperative as a discharge of the plaintiff's claim. And as the evidence shows that the defendant has the means to pay, the release must be declared void, and the plaintiff entitled to judgment for the amount of the loan unpaid, with interest."

This opinion seems to me to be a correct exposition of the law applicable to the facts found by the Special Term, and a careful examination of all the evidence satisfies me that the findings of fact made by the learned judge are sustained by evidence, and are substantially correct.

The instrument of March, 1867, by its express terms, left the defendant under a moral obligation to refund the money borrowed in February, 1866, in part or in whole, as his means would allow in the future. The moral obligation, thus assumed, was the consideration on which the discharge from legal liability was given. It differed in its nature from that kind of moral obligation which exists when a debt has been discharged by operation of law or by some proceeding *in invitum*, and which, in some cases, has been held to be a sufficient consideration to uphold an express promise to pay; for in this case no future express promise was contemplated or required. *The fact* that the means of the defendant in the future would allow payment of the money in whole or in part, brought the moral obligation into such vigorous operation as to make it a duty to pay, the failure to perform which restored the legal liability. Or, in other words, the instrument was nothing more or less than an agreement that the legal liability should be suspended until the debtor should be in such condition in the future that a moral obligation to pay would fairly exist, and then his failure to perform the moral obligation was to revive the legal liability. The parties were entirely competent to make such a contract, and it seems very clear that that was what they intended to do, and no forced construction or application of technical rules should prevent a court of equity from carrying out the intent. It is as if the defendant had said to this creditor "You release me now from legal liability, and as soon as my future means become such that I ought conscientiously to pay, I will do so by force of the moral obligation which shall continue in full effect."

Representations had been made by the defendant as to the condition of his affairs which may have been believed by him at that time to be true; and it is clear that the plaintiff's firm had acted in giving the instrument above mentioned in reliance upon such representations. It was known to the defendant that they so relied. But when he came for the *absolute release* in October following, his circumstances had materially changed. He had repudiated the sale of his interest in the stock of goods to Von Keller, and he knew that a sum had already been realized (to wit, $400,000), on the sales then made, and that a large amount remained unsold, which advanced

the value of his interest far beyond the sum at which he had before represented it to plaintiff's firm.

The plaintiff's firm were ignorant of this change of circumstances, and were acting under such ignorance. The defendant knew, or certainly had reason to know, they were so acting. I think it was his plain duty to have undeceived them by a frank and full disclosure of his altered circumstances and prospects. It is true the plaintiff's firm might have acted precisely as they did had such disclosure been made, but the court cannot speculate upon that probability because they have not had the opportunity of determining for themselves how they would act with such knowledge. They have acted without knowledge of facts *known* to defendant, and which it was his moral duty to state to them, and for that reason they may repudiate their action. The strict rules that apply between parties contracting at arms length, in which the better knowledge of either party is his own property, have no application to these parties, because the obligation does rest upon a debtor who is seeking to get a discharge from his indebtedness for less than its full amount, on the ground of his inability to pay more, not to induce or permit the action of his creditor by any false representation or material concealment or ignorance of any fact touching his own real condition. The utmost good faith is required on the part of the debtor, and he has no right to permit his creditor to act upon his belief in the correctness of representations previously made to him which have become untrue by reason of changes in the debtor's own affairs.

It is apparent that the changes which had taken place, and were unknown to the plaintiff in this case, were such as made the defendant then, or would soon, make him fully able to pay the whole of the money borrowed. He should have made the facts known to the plaintiff's firm, and his-failure to do so prevents his using the release as a defense in this suit.

I am not able, therefore, to concur with my brother, BRADY, but am of opinion that the judgment should be affirmed for the reasons set forth in the opinion of VAN VORST, J., indicated in this memorandum.

DANIELS, J., concurred.

Brady, J. (dissenting):

In February, 1866, the defendant, who had been for many years a successful merchant in this city, became embarrassed in his business, and, impressed with the conviction that he could no longer continue in trade, went to see Mr. Adolph Dambmann, one of the firm of C. F. Dambmann & Co., and who were his creditors, on the subject. He thus relates the interview: I saw Mr. Adolph Dambmann, and I told him I was sorry I had to come to see him, as I could not go on any longer in business. I came to see him and other creditors to see when it would suit them to hold a meeting, and to tell me to whom I should assign my assets, my stock and property and money, for the benefit of my creditors. Mr. Dambmann told me I must not do that, the loss they would meet would not be any thing, but others would do the same who had no need of it; that this house would rather give me thirty per cent, as a present, of the indebtedness than for me to make an assignment. I hesitated a moment, and told him that would not work; it would take me six months before I could get all the creditors to be so liberal as Mr. Dambmann was. I said: "If you, and other houses where I have dealt largely, will make me a present of $10,000, I will try to go on, pay it back, or keep it, as I choose, provided I paid my debts in full; but if I don't succeed to pay my business debts in full, then I make an assignment, and prefer this $10,000, and give the balance to my business creditors."

" Q. Did you see your other creditors? A. Yes. Q. Did you make a similar arrangement with them? A. I stated to them the talk I had with Mr. Dambmann; that I thought if I could keep from making an assignment, I would try to do the most I could. Q. Did you get the money from them? A. I did; they gave me all I asked for."

The plaintiff's account of it is not materially different.

" Q. Go back to February, 1866, and state what took place between you and Mr. Schulting at the time this money was advanced to him? A. Mr. Schulting came into our store and said he could not pay his debts in full or at maturity; that he had lost money by the fall of gold; I thereupon asked him how much he thought he could pay, he said he thought he could pay seventy cents on a dollar; I told him I thought his creditors would be willing to advance him the

balance, thirty cents, rather than to let him fail, and that we would be willing, on our part, to do so; after some days, Schulting came and said that he was willing to take the money that way — for him to return it when he would be able to pay it; but he wanted me to give him a check for $10,000, whereas he owed us only about $20,000 or $22,000; although this $10,000 was more than thirty per cent of our claim against him, we yet gave him the check for $10,000."

The result was, that certain creditors advanced the defendant $100,000, C. F. Dambmann & Co. contributing $10,000; and they all executed a paper, of which the following is a copy:

" We, the undersigned, agree not to demand, transfer or prosecute H. Schulting (except in case of his death or insolvency) for indebtedness to us for money advanced in February last, during this and the succeeding year of 1867."

The defendant succeeded in paying his debts, and then obtained, from the creditors who had made the advance mentioned, an instrument, of which the following is a copy:

" We, the undersigned creditors, agree, in consideration of one dollar paid to us, to discharge H. Schulting from the *legal* payment of the money loaned to him in February, 1866, said Schulting giving his *moral* obligation to refund the said money, in part or whole, as his means will allow in the future."

This paper was executed in March, 1867. The defendant continued in business until about the 4th August, 1868, when, as he alleges, on account of failing health, he was obliged to give up, and on that day sold his entire stock of goods to the firm of H. & A. Stursberg & Co. for the sum of $225,000, they agreeing to pay all his debts, with a further agreement that one-third of whatever the goods brought over $225,000 should belong to him, or to his wife. The goods thus bartered were sold by H. & A. Stursberg & Co., assisted, it is claimed, by the defendant, for the sum of $576,981, although the sales were not all made until the latter part of the year 1868. In the early part of August, 1868, the plaintiff called on the defendant in regard to the affairs which he had " heard outside," and what then took place is thus stated by the witness examined on his own behalf.

" Q. What did you say to him, and he to you? A. I had a

general business conversation with him — asked him how his affairs stood; Mr. Schulting stated to me that he had sold his property to Stursberg & Co., and, I think, Paine, Berry & Co., for the sum of $225,000, that is, his merchandise, and they were to pay his debts; debts for merchandise purchased, which would amount to about $190,000 or $192,000, which would leave him cash from $25,000 to $35,000; that he was also to keep his store, corner of Ann and William streets, valued at about $35,000, and his accounts which didn't amount to more than about $10,000; that property was to remain with Schulting, and they were to pay $225,000 for the stock of goods only, and pay all his business debts, that is, his debts for merchandise; then he said, as for that one-third interest in the sum which the goods would realize over $225,000 that was worthless; it was little or nothing; in fact, he had offered to sell it the other day for $18,000 or $20,000. Q. Did he say any thing further on that point than that he had offered it for $20,000? A. He said nothing more on that subject. Q. About what time did this conversation take place? A. The early part of August, 1868; it was after the sale to Stursberg had been made, and before the goods had been delivered, and which took place in his own store." In October following the defendant went to the plaintiff's store, and the following is a statement of what occurred, as given by the plaintiff: " Q. When he came to get this release state what was said? A. About the beginning of October, 1868, Mr. Schulting came into our store and said that he understood a previous paper which we had signed at his request *was not a legal release*, because he hadn't paid any thing on account of that $10,000, and he wanted to know if I would sign a legal release if he paid $5,000. Q. Did he say any thing else? A. No, sir." It is claimed on these, which are material facts, that the release was fraudulently obtained, because the defendant knew in October, 1868, that the third interest in the surplus was worth much more than $20,000, and suppressed or did not disclose the fact, and that not having done so, his statement, in August, must be carried forward by relation, and regarded as a statement repeated in October, 1868. And if this be not so, that he must be held to have improperly concealed the information he possessed about the value of the third interest, and was, therefore, guilty of fraud in obtaining the

release. The examination of the occurrence in August shows that there was then no application to the plaintiff for a release, and the investigation of the facts shows that what the defendant said of the value of the third interest was true, namely, that he had offered it for sale for $18,000 or $20,000. He did offer to sell it, and made an agreement thereto, for the sum of $20,000, and to one Herman Von Keller, and after the value of that third was ascertained Von Keller sought to recover on the agreement, but was defeated, because he had not paid or provided for the consideration mentioned in it.

It seems to be clear from these incidents, that the charge of fraud cannot rest upon the asseverations in August. The statement made was an opinion as to value, and this opinion is fortified and sustained in its honesty by the attempted sale of the interest for the sum agreed upon, and which would doubtless have been consummated, but for the failure of the vendee, Von Keller, to keep or perform his part of the contract relating to it. It would seem, too, from the evidence, that the unwillingness of the defendant to complete the contract arose from his wife's objections, and it can be said as entirely true that there is no evidence that the sale made was a sham, or collusive, or stamped with any fraudulent design or intent. This conclusion renders it erroneous to suppose that the statement of August by relation can avail the plaintiff, and his case must rest, therefore, upon the charge of the fraudulent concealment of a material fact. On this subject it is, perhaps, important to consider the relations between the parties in October, when the release was executed. The defendant had paid the debts due to his creditors, and from those who made the advance of $100,000 had obtained by their voluntary gift, the instrument which discharged him from the legal payment of the money loaned him, they taking his moral obligation to refund it, in part or in whole, as his means would allow, in the future. The effect of this agreement between the parties was to release the defendant from any liability which could be enforced in a court of justice, unless there was a promise to pay, which would doubtless revive the legal obligation. He was, when moved by the moral obligation, not to pay, but in the language of the contract, to refund in part or in whole, as his means would allow, and this made him the judge of what his means would

justify. In short, it placed him in the position of being the arbiter of his own case, the keeper of his own conscience, with this paper in his hand, and it may be said, with the ability to pay the plaintiff all of his previous demand, but under no legal obligation to do it, he went to the plaintiff and asked for a release, as already stated. He was asked no questions, and made no representations — none whatever. The plaintiff signed the paper, as others did. Was the defendant bound under the circumstances to make any statement? The rule of law applicable to such transactions, imposed upon him no such obligation, and to allow the plaintiff to recover would be in violation of it. The plaintiff, by ordinary diligence, could have learned what the goods had sold for. He could have obtained the information either from the defendant or his vendees, or if the defendant had refused to give the figures, or falsely stated them, he would then have either placed the plaintiff on inquiry, or have acted fraudulently, and therefore accomplished nothing by his release. The rule is thus stated by Chancellor KENT: " As a general rule, each party is bound to communicate to the other his knowledge of the material facts, provided he knows the other to be ignorant of them, and they be not open and naked, or equally within the reach of his observation." This rule, it is said, is too broadly stated to be sustained by the practical doctrine of the courts. The qualification of the rule is that the party in possession of the facts must be under some special obligation by confidence reposed or otherwise, to communicate them truly and fairly. (2 Kent, 642 [11th ed.]; *Bench* v. *Sheldon*, 14 Barb., 72 ; 1 Story's Eq. Com., § 207.)

The common law, said the ex-chancellor affords to every one reasonable protection against fraud in dealing, but it does not go the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information. (Id., p. 646.) In respect to intrinsic circumstances, the rule is, that mere silence as to any thing which the other might by proper diligence have discovered, and which is open to his examination, is not fraudulent, unless a special trust or confidence exist between the parties, or be implied from the circumstances of the case. (Story on Contracts, § 519.) In settling the law on this subject, it has on the one hand, been the aim of our

courts to repress dishonesty, whilst on the other they have required that before relieving a party from a contract on the ground of fraud, it should be made to appear that in entering into it, he exercised a due degree of caution *vigilantibus et non dormientibus succurrunt jura.* (Chitty on Contracts, 588 [8th Am. ed.].) The rule in equity is the same. The true definition then of undue concealment (which amounts to a fraud), in the sense of a court of equity, and for which it will grant relief, is the non-disclosure of those facts and circumstances, which one party is under some legal or equitable obligation to communicate, and which the other party has a right not merely in *foro conscientiæ* but *juris et de jure* to know. (1 Story Eq. Com., § 207.) The special trust did not exist in this case. There was no existing relation which made it the duty of the defendant to disclose his knowledge of the value of the third interest in October, 1868. The release of all except the moral obligation did not relate to it, for that paper extended to his future acquisitions of all kinds, the future means which he should possess. He was not obliged in *foro conscientiæ* to disclose it. Indeed, it is evident that he could not then declare with certainty that it was worth more to him than the sum which he had agreed to accept for it, because his contract was outstanding, and his vendee was at first successful in his efforts to enforce that instrument, although the court of last resort ultimately decided in the defendant's favor. These are, however, positive elements on the question of fraudulent concealment — the *suppressio veri* which by being fraudulent in character avoids the contract.

The remarks of Chancellor KENT apply to this case. "From this and other cases it would appear that human laws are not so perfect as the dictates of conscience, and the sphere of morality is more enlarged than the limits of civil jurisdiction.

"There are many duties that belong to the class of imperfect obligations which are binding on the conscience, but which human laws do not, and cannot undertake directly to enforce." (2 Kent, § 39, pp. 490, 491.)

The judgment should be reversed, with costs to abide event.

**Judgment affirmed.**